IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| DENEE G. COLLINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 05-0924-CV-W-NKL-SSA |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

Pending before the Court is Plaintiff Denee G. Collins' ("Collins") Motion for Summary Judgment [Doc. # 6]. Collins seeks judicial review of the Commissioner's denial of her request for disability insurance benefits under Sections 216(i) and 223 of the Social Security Act. The Administrative Law Judge ("ALJ") found that Collins was not entitled to benefits, and such determination became the final decision of the Commissioner when the Appeals Council denied Collins' request for review. Collins has exhausted her administrative remedies, and jurisdiction is conferred on this Court pursuant to 42 U.S.C. § 405(g). Because the Court finds that the Administrative Law Judge's decision is supported by substantial evidence in the record as a whole, Collins' Motion for Summary Judgment will be denied.

**I.      Background**

1

### A.     Collins' Medical History

Collins is a thirty-nine year old woman who worked as a secretary and bookkeeper. (Tr. 36, 99-102, 106.) On April 16, 2002, Collins was injured in a motor vehicle accident. (Tr. 109.) On the day of the accident, Collins complained of neck, back and shoulder pain. (Tr. 366-68.) Two days later, Dr. Arthur Buren, M.D., examined Collins. Dr. Buren prescribed Darvocet for her pain and ordered an MRI of her back. (Tr. 413.) The MRI revealed that Collins had a bulging disk at L4-L5. (Tr. 409.) On May 17, 2002, Collins received followed up treatment from Dr. Debra Keith, D.O., to whom she complained of continuing pain to her back and shoulders. (Tr. 417-18.) Dr. Keith prescribed Naprosyn (Tr. 418) and directed her to apply moist heat packs daily to her back and shoulders for 30 minutes at a time in order to help alleviate her back pain. (Tr. 218.)

Collins continued to complain of low back, neck and interscapular pain over the next month. On June 26, 2002, Dr. Michael Copeland, M.D., treated Collins. Dr. Copeland determined that she had a central disk herniation at L4-L5. (Tr. 700-01.) Dr. Copeland considered treatment options such as a diskectomy or epidural blocks, but did not believe the treatments would reduce Collins' pain and recommended against them. (Tr. 699-701.)

Two days later, on June 28, 2002, Collins arrived in the emergency room complaining of headaches, dizziness and spots in her vision while at work. (Tr. 369.) She also complained of tingling and heaviness in both arms and numbness and tingling in

her face. (Tr. 370.) Collins was discharged the next day, but continued to have the same symptoms, plus complaints of vertigo. (Tr. 148-50.) On July 2, 2002, Collins was admitted to the hospital with complaints of numbness and tingling to the left side of her face, facial weakness and slurred speech. (Tr. 167.) On this hospital visit, Collins was treated by Dr. Jeffrey Kaplan, M.D., a neurologist who subsequently became her primary treating physician. Dr. Kaplan's initial diagnosis was that Collins had a complicated posttraumatic migraine with likely small right subcortical and cerebral infarction. (Tr. 170.) Dr. Kaplan also noted that Collins had significant TMJ with bilateral clicks, and that an echocardiogram revealed the existence of a patent foramen ovale (PFO), a small hole between the atrium and ventricle of her heart. (Tr. 170.) Dr. Kaplan instructed Collins to take Vicodin, Plavix and aspirin for her pain. (Tr. 426.) In an August 8, 2002 letter to Collins' health insurance carrier, Dr. Kaplan stated that Collins had a "complicated post traumatic migraine" and "post traumatic myofascial syndrome of the neck and low back." (Tr. 423.) According to Dr. Kaplan, Collins was having daily headaches, as well as numbness and tingling in her face and "persistent low back pain with significant muscle tension in her lumbar paraspinal muscles." (Tr. 423.)

     Collins returned to the hospital on August 17, 2002, with complaints of tingling in the left side of her face and left arm. She also complained of a continuous and severe headache, which had lasted two days. (Tr. 180.) During this hospital stay, Dr. Kaplan diagnosed a probable migraine with prolonged aura. (Tr. 178.) Dr. Kaplan also believed that Collins exhibited signs of functional overlay and symptom embellishment. (Tr. 178,

3

181, 183, 632.) On August 21, 2002, after several days of tests, Collins was discharged with directions to take Plavix and aspirin. (Tr. 179.)

On October 17, 2002, Collins was readmitted to the hospital with complaints of chest discomfort and tightness radiating up to her neck. (Tr. 215.) During her six day stay at the hospital, Collins was examined by a cardiologist, Dr. Douglas Bogart, M.D. She was eventually referred to the Mayo Clinic. (Tr. 216.) At the time of her discharge, she remained on Coumadin and aspirin. (Tr. 339.)

Collins was evaluated at the Mayo Clinic from November 5 through November 14, 2002. Despite numerous tests and evaluation by several physicians, no new diagnosis was made. Testing at the Mayo Clinic indicated that Collins exhibited a tendency to develop functional complaints, such as headaches and backaches, as a way to get attention and support. (Tr. 277.) Testing also showed that "Collins is likely to be excessively emotional and perhaps self-absorbed, requiring significant emotional reassurance, support, and care." (Tr. 277.) Furthermore, the data suggested that Collins could be prone to develop functional complaints, such as headaches and backaches, which she might present in a dramatic fashion. (Tr. 277.) Finally, the evaluation doctor believed that Collins was "clearly quite somatically focused." (Tr. 277.)

On May 21, 2003, Dr. Kaplan wrote a "to whom it may concern" letter indicating that "Collins . . . suffers from severe migraines and a history of a cerebral infarction. Due to both of these significant medical problems, she is unable to work at this time." (Tr. 421.) In addition, in a July 1, 2003 memorandum, Dr. Kaplan wrote "[s]ince her last

4

visit, [Collins] is still having chronic daily headache and once weekly it is severe. . . . The patient clearly has permanent problems related to this motor vehicle accident and will have slow improvement in her symptoms due to all of her above problems. She cannot be gainfully employed and will clearly need further medical treatment." (Tr. 422.)

On May 12, 2004, Dr. Kaplan was deposed in a legal case involving Collins' automobile accident. Dr. Kaplan testified that Collins showed a positive Hoover's sign, which indicated symptom embellishment. (Tr. 632.) He further testified that a motor examination indicated that Collins was not giving full effort during testing, and that she was under no medical restrictions due to her neck and back. (Tr. 632, 634.) Dr. Kaplan noted that stress could exacerbate Collins' headaches, but that he had not placed any restrictions on her due to her headaches. (Tr. 634.)

Collins has been hospitalized a total of 67 days from the time her migraine headaches began on June 28, 2002 to the April 5, 2005, ALJ hearing.

**B.  The Hearing**

In the spring of 2002, Collins worked with accounts payable at the Aviation Department of the City of Kansas City, Missouri. (Tr. 36.) Collins testified that, after the April 16, 2002, accident, she returned to her job on a part-time basis, but was unable to continue because of her migraines. (Tr. 37.) Collins testified that she would work approximately four hours, but then "would get sick and . . . get the headaches, start seeing spots and end up being hospitalized." (Tr. 37.) Collins testified that she last worked in October of 2002 (Tr. 37).

Collins drives her kids a few miles to school every day and, on some days, drives her kids to after school activities. (Tr. 35-36.) Even if suffering from a migraine, Collins still drives her kids to school, but returns home immediately and goes to bed. (Tr. 50.) Collins testified that she has migraines at least twice per week and that the migraines last for "a couple days." (Tr. 50.)

In addition to the headaches, Collins' activities are limited by her PFO. She testified that she has difficulty carrying laundry (Tr. 43) and is unable to vacuum or sweep (Tr. 45). Also, Collins does not make beds, clean bathrooms or do yard work, though she is able to load and unload the dishwasher, fold laundry and occasionally dust. (Tr. 45-46.) She testified that she is unable to walk a block and can only stand for 15 minutes and sit for 45 minutes. (Tr. 46-47.)

Collins' husband, Edward Collins, also testified at the ALJ hearing. He confirmed Collins' statement that other family members do most of the housework. (Tr. 56.) Edward Collins described his wife's headaches as so bad that "she would have droopiness in her face." (Tr. 57.) Mr. Collins estimated that his wife had such migraines at least once a month and that each one rendered her incapacitated for three to five days. (Tr. 62.) Mr. Collins believed that his wife was having one such debilitating migraine on the day of the hearing. (Tr. 61.)

Amy Salva, a vocational counselor, also testified at the ALJ hearing. The ALJ posed the following question to Salva:

> I'd like for you to assume for me a hypothetical person of

6

>     between 36 and 38 years with a high school or better
>     education. And this hypothetical person would have the
>     ability to do sedentary exertional work lifting no more
>     than 10 pounds. And being able to stand and walk no
>     more than two hours in an eight hour day. Could be able
>     to only occasionally climb, balance, stoop, kneel, crouch,
>     or crawl. In addition, they would need to avoid
>     concentrated exposure to excessive cold or fumes and
>     odors. Given that hypothetical person, in your opinion,
>     could that hypothetical person do any of the work . . . that
>     [Collins] has done in the past?

(Tr. 65.) Salva determined that a person with these hypothetical symptoms could perform the secretarial/bookkeeping work that Collins had done in the past. (Tr. 66.) Salva further testified that this hypothetical person could maintain her job while still taking up to two unscheduled days off each month. (Tr. 67.)

## II. Discussion

To establish that she is entitled to benefits, Collins must show that she is unable to engage in any substantial gainful activity by reason of a medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d) and § 1382c(a)(3)(A). Collins has not met this burden. The specific issues in this case are:

> Did the ALJ properly determine Collins' credibility and properly consider the opinion of Collins' treating physician, Dr. Kaplan?
>
> Did the ALJ pose a proper hypothetical question to the vocational expert at the administrative hearing?

The standard of appellate review of the Commissioner's decision is limited to a determination of whether the decision is supported by substantial evidence on the record

7

Case 4:05-cv-00924-NKL   Document 11   Filed 10/16/06   Page 7 of 13

as a whole.  *Johnson v. Chater*, 108 F.3d 178, 179 (8th Cir. 1997).  If, after reviewing the record, the Court finds that it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner.  *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000) (citations omitted).  The Eighth Circuit has stated that the court defers "heavily to the findings and conclusions of the SSA."  *Howard v. Massanari*, 255 F.3d 577, 581 (8th Cir. 2001).

After consideration of the record, the ALJ found that Collins had severe impairments of migraines, cardiovascular disease, and degenerative disc disease of the lumbar and thoracic spine, (Tr. 24), but did not have an impairment or combination of impairments listed in or medically equal to one contained in 20 C.F.R. § 404, Subpart P, Appendix 1, Regulations No. 4.  The ALJ further found that Collins' impairments would not preclude her from performing her former work.  (Tr. 26.)  Consequently, the ALJ found Collins was not disabled.

### A. The ALJ Properly Assessed Collins' Credibility and Properly Considered Dr. Kaplan's Opinions.

Prior to rejecting a claimant's subjective complaints, the ALJ is required to make an express credibility determination explaining why he does not fully credit the claimant's complaints.  *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000).  "If an ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so, we will

8

normally defer to that judgment." *Hogan v. Apfel*, 239 F.3d 958, 962 (8th Cir. 2001) (quotation omitted). The Eighth Circuit has repeatedly stated that, where adequately explained and supported, credibility findings are for the ALJ to make. *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (citing *Tang v. Apfel*, 205 F.3d 1084, 1087 (8th Cir.2000)); *McKinney v. Apfel*, 228 F.3d 860, 864 (8th Cir. 2000). In this case, the ALJ considered multiple proper factors in assessing the credibility of Collins' subjective complaints.

The ALJ considered Collins' reported daily activities in his credibility analysis. "Allegations of pain may be discredited by evidence of daily activities inconsistent with such allegations." *Davis v. Apfel*, 239 F.3d 962, 967 (8th Cir. 2001) (citing *Benskin v. Bowen*, 830 F.2d 878, 883 (8th Cir.1987)). The ALJ noted that despite Collins' complaints of debilitating migraine headaches, she was able to take her children to and from school even when she had a migraine headache, and took them to after school activities. (Tr. 25, 35-36, 50.) Collins testified that she attended her children's activities and was able to sit in the bleachers for awhile before having to stand or leave. (Tr. 49.) Collins stated that she was able to clean up around her house, as well as watch her children when they were not in school. (Tr. 25, 45.) She stated that she loaded and unloaded the dishwasher, dusted once in awhile, and folded laundry. (Tr. 45-46.) The ALJ noted that Collins' reported activities were not extensive, but believed that they indicated an ability to perform at least sedentary activities on a daily basis. (Tr. 25.)

The ALJ noted that Dr. Kaplan's reports supported a conclusion that Collins was doing relatively well other than her migraine headaches. (Tr. 25, 634.) In his deposition,

9

Dr. Kaplan stated that Collins would not be limited from working by her neck, back, or cardiac condition. (Tr. 25, 634.)

The ALJ noted evidence that Collins may have exaggerated her symptoms. (Tr. 25.) An ALJ may properly consider a claimant's exaggeration of her symptoms in evaluating her subjective complaints. *Jones v. Callahan*, 122 F.3d 1148, 1152 (8th Cir. 1997); *Jenkins v. Bowen*, 861 F.2d 1083, 1086 (8th cir. 1988). The evidence shows that during an August 2002 examination, Dr. Kaplan believed that Collins exhibited signs of functional overlay. (Tr. 25, 178, 181, 183.) During deposition testimony on May 12, 2004, Dr. Kaplan explained that examination on August 17, 2002, showed a positive Hoover's sign which indicated symptom embellishment. (Tr. 632.) A subsequent motor examination was described as "variable." (Tr. 632.) Dr. Kaplan explained that this indicated that Collins was not giving full effort during testing. (Tr. 632.)

Although Dr. Kaplan has subsequently stated that he did not believe that Collins was exaggerating her symptoms, there is other evidence in the record of embellishment. Testing performed in November 2002 at the Mayo Clinic indicated that Collins exhibited a tendency to develop functional complaints such as headaches and backaches as a way to get attention and support. (Tr. 277.) Specifically, tests showed that Collins was likely to be excessively emotional and perhaps self-absorbed, requiring significant emotional reassurance, support, and care. (Tr. 277.) The data suggested that Collins could be prone to develop functional complaints (such as headaches or backaches) which she might present in a dramatic fashion. (Tr. 277.) The evaluating doctor believed that Collins was

"clearly quite somatically focused," and that the data suggested the likelihood of a somatoform component to Collins' difficulties. (Tr. 277.) Contrary to Collins' assertion, the Mayo Clinic records indicate that doctors other than Dr. Kaplan indicate that Collins may have been exaggerating her symptoms. Symptom embellishment was a proper factor for the ALJ to consider when determining the credibility of Collins' subjective complaints.

Collins argues that the ALJ erred by not giving controlling weight to Dr. Kaplan's opinions. [Pl.'s Br. at 13-15.] "[T]he ALJ need not give controlling weight to a physician's RFC assessment that is inconsistent with other substantial evidence in the record." *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004). As stated above, the ALJ provided multiple, significant reasons for not giving controlling weight to Dr. Kaplan's opinions. The ALJ stated that he found much of Dr. Kaplan's assessment of Collins to be persuasive, but Dr. Kaplan's overall conclusion that Collins could not work was not persuasive. (Tr. 23.) The Eighth Circuit has specifically held that a physician's opinion that a claimant cannot be gainfully employed is not a medical opinion. Whether or not someone qualifies for social security benefits is solely the responsibility of the ALJ. *Nelson v. Sullivan*, 946 F.2d 1314, 1316 (8th Cir. 1991). The ALJ noted this rule of law, stating that "[w]hat jobs might be available for an individual with the claimant's limitations is beyond Dr. Kaplan's scope of expertise and better decided by a vocational expert." (Tr. 23-24.) Finally, the ALJ stated that Dr. Kaplan's conclusion did not clearly state why Collins should be precluded from all work. (Tr. 24.) The ALJ provided

11

adequate rationale for giving little weight to Dr. Kaplan's opinion that Collins could not work.

> **B.     The ALJ Posed a Proper Hypothetical Question to the Vocational Expert at the Administrative Hearing.**

Collins argues that the ALJ's hypothetical question to the vocational expert at the administrative hearing was inadequate. [Pl.'s Br. at 16-18.] Specifically, Collins states that she would miss more than two days of work per month. [Pl.'s Br. at 17.] Although the hypothetical question must set forth with reasonable precision the claimant's impairments, *Starr v. Sullivan*, 981 F.2d 1006, 1008 (8th Cir. 1992), it need only include those impairments and limitations found credible by the ALJ. *Pertuis v. Apfel*, 152 F.3d 1006, 1007 (8th Cir. 1998); *Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997). As discussed in the previous section, the ALJ properly found that Collins' allegations regarding her limitations were only partially credible. (Tr. 27.) As a result, the ALJ was not required to include limitations that he did not find credible in the hypothetical he posed to the vocational expert.

## III.   Conclusion

A review of the ALJ's decision on the record as a whole reveals that it is supported by substantial evidence. Accordingly, it is hereby

ORDERED that Collins' Motion for Summary Judgment [Doc. #6] is DENIED. The decision of the Commissioner is AFFIRMED.

/s/ NANETTE K. LAUGHREY
NANETTE K. LAUGHREY
United States District Judge

Dated: OCTOBER 16, 2006
Jefferson City, Missouri